Thomas LETIZIA, et al., Plaintiffs,

v.

FACEBOOK INC., Defendant.

Case No. 16–cv–06232–TEH

United States District Court, N.D. California.

Signed 07/14/2017

Gregory David Rueb, Joseph Anthony Motta, Rueb & Motta, A Professional Law Corporation, Concord, CA, Artemus W. Ham, Erica D. Entsminger, Robert M. Adams, Robert T. Eglet, Eglet Prince, Las Vegas, NV, for Plaintiffs.

Ashok Ramani, Briggs James Matheson, Elizabeth Katharine McCloskey, Ian Asher Kanig, Michelle Sabrina Ybarra, Paven Malhotra, Keker Van Nest & Peters LLP, San Francisco, CA, for Defendant.

### ORDER GRANTING IN PART AND DENYING IN PART FACEBOOK'S MOTION TO DISMISS

THELTON E. HENDERSON, United States District Judge

Presently before the Court is Defendant Facebook, Inc.'s ("Facebook") motion to dismiss Plaintiffs' consolidated class action complaint. ECF No. 46 ("Mot."). Plaintiffs timely opposed the motion, ECF No. 54 ("Opp'n"), and Facebook timely replied, ECF No. 56 ("Reply"); Facebook also filed a request for judicial notice in support of its motion to dismiss. See ECF No. 47. The Court heard oral arguments on Facebook's motion and request on June 19, 2017. See ECF No. 61. After carefully considering the parties' written and oral arguments, the Court hereby GRANTS IN PART and DENIES IN PART Facebook's motion and request for judicial notice for the reasons set forth below.

## I. BACKGROUND

The following factual allegations are taken from Plaintiffs' Consolidated Amended Class Action Complaint, ECF No. 34 ("Compl."), unless otherwise stated, and are therefore accepted as true for the purposes of this motion. See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555–56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

Facebook, Inc. operates Facebook.com, a social media service with 1.79 billion monthly active users. Compl. ¶¶ 13–14. Users are not charged to create a Facebook.com account. Once an account is made, users can, among other things, create a profile page, post content, make friends with other users, and view content posted by other users. Id. ¶ 14. Instead of charging account holders to access Facebook.com, Facebook makes more than 95% of its revenue by selling advertising services. Id. ¶ 15.

One type of advertising that Facebook sells is video advertisements, where advertisers can pay money to have video displayed to Facebook users. These video advertisements autoplay by default when Facebook users engage with the platform, but users are allowed to scroll past autoplaying videos (including paid advertisements) without ever watching more than a few seconds of the video. Id. at 16. Facebook's video advertisements are provided

with accompanying advertising metrics, which enable purchasers to monitor and evaluate their video advertisements' performance. *Id.* ¶ 18. These metrics are a main selling point of online advertising because they offer more detailed and closer to real-time marketing analytics than other traditional advertising mediums like television or radio. *Id.* Online advertisers use these analytics to determine where to spend advertising dollars and the effectiveness of their dollars spent. *Id.* Plaintiffs allege advertising metrics have "become a standard practice in the industry for online advertisers," which is evidenced by companies like YouTube, LinkedIn, Twitter, and Facebook all providing video advertisements with advertising metrics. *Id.* ¶¶ 18–19.

In May 2014, Facebook rolled out new advertising metrics, which included "Average Duration of Video Viewed" ("ADVV") and "Average Percentage of Video Viewed" ("APVV"). *Id.* ¶¶ 20–21, 25. The ADVV metric is viewed by many advertisers as one of the most important analytics used in evaluating video advertisement performance. This is because "the longer people watch an advertisement, the greater the advertisement's impact on the viewer." *Id.* ¶ 21. After Facebook's announcement, Plaintiffs, who consist mostly of advertising and marketing professionals and entities, purchased Facebook's video advertising services with the understanding that these advertising metrics were included in the purchased video advertising services. *Id.* ¶¶ 6–11, 23. Facebook never disclosed that these new metrics were not audited or accredited by the Media Rating Council, the marketing industry's "standard-bearer" for accurate measurements. *Id.* ¶ 23.

Facebook had previously told advertising purchasers that the ADVV would be calculated by dividing the total time spent watching the video by all users by the total number of users who spent any time watching the video. *Id.* ¶ 26. However, in August 2016, Facebook disclosed in its "Advertising Help Center" that this metric had been improperly calculated. *Id.* ¶ 27. Rather than calculating the ADVV by dividing the total time spent watching the video by *all* users by the total number of users who spent *any* time watching the video, Facebook had been dividing the total time spent watching the video by all users by only the total number of users who spent *three or more seconds* watching the video. *Id.* As a result, the APVV was also erroneously calculated because Facebook calculated this metric using the ADVV as a calculation input. *Id.* On or about September 23, 2016, David Fischer, Facebook's Vice President of Business and Marketing Partnerships, confirmed that, due to Facebook's miscalculation, Facebook had overstated this ADVV metric. *Id.* ¶ 28. Moreover, Facebook informed some of its advertisers that the ADVV metric was inflated between 60–80%, thus making Facebook's video advertisements appear as if they were performing better than they actually were. *Id.* ¶ 33.

Plaintiffs allege Facebook's misrepresentations induced them to purchase the video advertisement because they "wanted accurate video advertising metrics regarding [ADVV] and [APVV] so that they could monitor their video advertisements' performance." *Id.* ¶ 36. Plaintiffs also allege Facebook's misrepresentations induced them to "continue purchasing video advertisements," to "purchase additional video advertisements" and to "pay more for Facebook video advertising than they would otherwise have been willing to pay." *Id.* ¶¶ 37–38. Lastly, Plaintiffs allege Facebook's misrepresentations: artificially increased the price of Facebook video advertising, provided Facebook with an unfair competitive advantage over other online

video advertising platforms, and interfered with Plaintiffs' attempts to utilize Facebook's video advertising analytics and to run effective video advertising campaigns. *Id.* ¶¶ 30–41. Plaintiffs seek to represent the following class: "All persons or entities who, from May 4, 2014 to Sept. 23, 2016 [the "Class Period"], had an account with Facebook, Inc., and who paid for placement of video advertisements on a Facebook-owned website."[1] *Id.* ¶ 43. Plaintiffs allege three causes of action: (1) a violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*); (2) a breach of an implied duty to perform with reasonable care; and (3) a quasi-contract claim for restitution. Compl. ¶¶ 54–77.

## II. REQUEST FOR JUDICIAL NOTICE

As a preliminary matter, the Court first turns to address Facebook's request for judicial notice prior to addressing Facebook's motion to dismiss.

### a. Legal Standards

 In deciding a Rule 12(b)(6) motion, the court generally looks only to the face of the complaint and documents attached thereto. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002). A court must normally convert a Rule 12(b)(6) motion into a Rule 56 motion for summary judgment if it "considers evidence outside the pleadings.... A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d

903, 907–08 (9th Cir. 2003). Stated differently, in ruling on a motion to dismiss, the Court can consider material that is subject to judicial notice under Rule 201 of the Federal Rules of Evidence. Under Rule 201, the Court may take judicial notice of a matter or fact when it is "not subject to reasonable dispute" because it is either "(1) generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). And under the incorporation by reference doctrine, a court may consider a document extrinsic to the complaint if the document's "authenticity is not contested and the plaintiff's complaint necessarily relies on [it]." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (citation omitted). A plaintiff's complaint necessarily relies on an extrinsic document "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Ritchie*, 342 F.3d at 908 (citations omitted).

### b. Discussion

Facebook requests judicial notice of five documents: (1) Facebook's Statement of Rights and Responsibilities ("SRR") in existence during the Class Period, ECF No. 47–2 ("Duffey Decl."); (2) Facebook's Self-Serve Ad Terms during the Class Period; (3) Facebook's Advertising Guidelines during the Class Period; (4) Facebook's Payment Terms during the Class Period; and (5) a Facebook Business Post made by David Fischer, Facebook's Vice President of Business and Marketing Partnerships, on September 23, 2016. ECF No. 47 at 1:11–2:3. Facebook suggests that Plaintiffs

---

1. Plaintiffs' class expressly excludes Facebook; any entity in which Facebook has a controlling interest; Facebook's officers, directors, legal representatives, successors, subsidiaries, and assigns; any judge, justice, or judicial officer presiding over this matter and the members of their immediate families; and judicial staff. Compl. ¶ 43.

refer to these materials in their complaint and that they form the basis of Plaintiffs' misrepresentation and contract claims. *Id.* at 1:21–2:3. Facebook also states it "does not seek to judicially notice the truth of any of the statements contained in these documents, but merely their existence." *Id.* at 2:1–3. Because neither party disputes the existence and authenticity of Facebook's contracts and because Plaintiffs do not oppose the Court taking judicial notice of documents 1–4, the Court GRANTS this request.

With regard to document 5, Plaintiffs oppose the Court taking judicial notice of Fischer's Facebook post because Facebook relies on the Facebook post in its motion to dismiss to establish the truth of the matters stated in the post—i.e., that the miscalculation "had no impact whatsoever on billing" and that Facebook "promptly fixed the Average Duration Metric discrepancy." ECF No. 55 at 1:12–28. Facebook later conceded in its Reply that it was indeed relying on the post's statement that "Facebook has fixed the error at issue—as extrinsic evidence in support of its challenge to Plaintiffs' standing to obtain injunctive relief." ECF No. 57 at 1: 27–2:1. During oral arguments, the Court probed Facebook's request by directly asking why judicial notice of Mr. Fischer's post is needed at all, to which Facebook replied it did not think judicial notice was needed. ECF No. 63 at 6:4–8. Accordingly, the Court DENIES Facebook's request for judicial notice of Mr. Fischer's Facebook post.

## III. MOTION TO DISMISS

### a. Legal Standard

Dismissal is appropriate under Rule 12(b)(6) when a plaintiff's allegations fail "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Specifically, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

In ruling on a motion to dismiss, a court must "accept all material allegations of fact as true and construe the complaint in a light most favorable to the non-moving party." *Vasquez v. L.A. Cty.*, 487 F.3d 1246, 1249 (9th Cir. 2007). Courts are not "bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (citation omitted). Dismissal of claims that fail to meet this standard should be with leave to amend, unless it is clear that amendment could not possibly cure the complaint's deficiencies. *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296, 1298 (9th Cir. 1998).

In addition, fraud claims are subject to a heightened pleading standard. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Allegations of fraud must state "the who, what, when, where, and how" of the misconduct charged, as well as "what is false or misleading about a statement, and why it is false." *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (citation omitted). Such allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute

the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (citation omitted).

### b. Discussion

#### i. Plaintiffs' UCL Claim

 "To bring a UCL claim, a plaintiff must show either an (1) unlawful, unfair, or fraudulent business act or practice, or (2) unfair, deceptive, untrue or misleading advertising." *Lippitt v. Raymond James Fin. Servs. Inc.*, 340 F.3d 1033, 1043 (9th Cir. 2003) (internal quotation marks omitted). Because the UCL is written in the disjunctive, "it establishes three varieties of unfair competition-acts or practices which are unlawful, or unfair, or fraudulent." *Cel–Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999). Plaintiffs allege that Facebook violated the UCL under both the "fraudulent" and "unfair" prongs. Compl. ¶¶ 54–61. Facebook contends Plaintiffs' UCL claim fails to state a claim for three reasons. First, Facebook claims Plaintiffs have failed to plead actual reliance. Second, Facebook claims Plaintiffs have failed to meet the Rule 9(b) heightened pleading standard. And third, Facebook claims Plaintiffs have failed to show how Facebook's conduct was "unfair." The Court turns to address each of Facebook's contentions.

#### 1. Plaintiffs Fail to Allege Actual Reliance

 To establish standing under the UCL, a plaintiff must demonstrate that he or she "suffered an injury in fact and [ ] lost money or property *as a result of* the unfair competition." Cal. Bus. & Prof. Code § 17204 (West 2017) (emphasis added). Although the UCL does not define the meaning of the phrase "as a result of," *see*

*In re Tobacco II Cases*, 46 Cal.4th 298, 325, 93 Cal.Rptr.3d 559, 207 P.3d 20 (2009), "California courts have held that when the 'unfair competition' underlying a plaintiff's UCL claim consists of a defendant's misrepresentation, a plaintiff must have actually relied on the misrepresentation, and suffered economic injury as a result of that reliance, in order to have standing to sue." *In re iPhone Application Litig.*, 6 F.Supp.3d 1004, 1013 (N.D. Cal. 2013). This actual-reliance requirement has been extended to claims under the unlawful prong of the UCL when the predicate unlawful conduct is based on misrepresentations. *Durell v. Sharp Healthcare*, 183 Cal.App.4th 1350, 1363, 108 Cal.Rptr.3d 682 (2010). Thus, in order for a UCL claim to survive a motion to dismiss, a plaintiff must sufficiently satisfy the actual-reliance requirement, which means the plaintiff must allege that he or she saw the specific misrepresentation at issue and actually relied on it. *Id.* A mere factual nexus causation between a defendant's conduct and the plaintiff's injury is not enough to support a UCL claim. *Id.* at 1362–63, 108 Cal.Rptr.3d 682 (citing *In re Tobacco II Cases*, 46 Cal.4th at 325, 93 Cal.Rptr.3d 559, 207 P.3d 20).

 Facebook argues Plaintiffs lack standing to bring forth their UCL claim because Plaintiffs have not shown actual reliance—i.e., Plaintiffs have not alleged they *actually saw* either of the erroneous metrics at issue and *because of* that metric decided to spend more money on Facebook video ads. Mot. at 8:7–11. Plaintiffs counter that they do have standing because their complaint states they were "induced" by the metric, which would necessarily require Plaintiffs to see and rely on the inflated metric. Opp'n at 7:25–28. The Court agrees with Facebook. Indeed, as Facebook correctly points out, Plaintiffs never state in their complaint that they

ever saw the miscalculated metrics; Plaintiffs do not contend otherwise. And while Plaintiffs cite to *In re Google Adwords Litig.*, No. C 08-03369 JW, 2011 WL 7109217, at *4 (N.D. Cal. Mar 17, 2011), where a court found actual reliance was established by the plaintiffs' allegations that "as a result of Defendant's fraudulent conduct, they spent money on advertising that they would not have otherwise spent," the Court is more persuaded by the numerous other decisions that have required plaintiffs to allege they actually saw and relied on alleged misrepresentations. *See, e.g., Figy v. Amy's Kitchen, Inc.*, No. CV 13-03816 SI, 2013 WL 6169503, at *4 (N.D. Cal. Nov. 25, 2013) ("to adequately allege reliance, a plaintiff must still at a minimum allege that he saw the representation at issue."); *Durell*, 183 Cal.App.4th at 1363, 108 Cal.Rptr.3d 682 (affirming dismissal of plaintiff's UCL claim where plaintiff failed to allege that he ever saw and read the alleged misrepresentations); *Kane v. Chobani*, No. 12-CV-02425-LHK, 2013 WL 5289253, at *8 (N.D. Cal. Sept. 19, 2013) ("Under the UCL and the FAL, as modified by Proposition 64, Plaintiffs are typically required to establish reliance by alleging facts showing they 'viewed the defendant's advertising,' ");*Bruton v. Gerber Prods. Co.*, 961 F.Supp.2d 1062, 1091 (N.D. Cal. 2013) (dismissing UCL claim where plaintiff claimed she relied on defendant's statements but failed to allege that "she ever actually viewed any of the alleged misrepresentations"), *reversed on other grounds and remanded by Bruton v. Gerber Prods. Co.*, No. 15-15174, 2017 WL 1396221 (9th Cir. Apr. 19, 2017). During oral arguments, Plaintiffs' counsel represented their claim could be amended to cure this deficiency. *See* ECF No. 63 at 27:24–28:4.

Accordingly, the Court GRANTS Facebook's motion to dismiss Plaintiffs' UCL claim WITHOUT PREJUDICE. While this may end the Court's inquiry into Plaintiffs' UCL claim, for the benefit of the parties the Court shall proceed to address Facebook's other contentions.

### 2. Plaintiffs Meet the Rule 9(b) Heightened Pleading Standard

At the outset, the Court notes that both parties agree that Federal Rule of Civil Procedure 9(b) applies here. *See* Mot. at 9; Opp'n at 8–10. Thus, the parties acknowledge Plaintiffs must state "the who, what, when, where, and how" of the misconduct charged, as well as "what is false or misleading about a statement, and why it is false." *Vess*, 317 F.3d at 1106 (citation omitted). Such allegations must be specific enough to put defendants on notice of the particular misconduct which is alleged so that they can defend against the charge and not just deny that they have done anything wrong. *Kearns*, 567 F.3d at 1124 (citation omitted).

Facebook alleges Plaintiffs' UCL claim should be dismissed because it fails to meet Rule 9(b)'s heightened pleading standard. In particular, Facebook alleges: "Plaintiffs fail to allege which specific misrepresentations are at issue, when and where Facebook made those specific misrepresentations, when Plaintiffs viewed or relied on them, and how they did so. Nor do they identify which particular ad campaign they allege to have viewed the particular metrics on." Mot. at 9:12–15. In contrast, Plaintiffs contend Rule 9(b) does not require such a degree of detail and that the details in their complaint are sufficient to allow Facebook to properly defend itself of the charges. Opp'n at 9.

Aside from the lack of actual reliance discussed above, which dooms Plaintiffs' UCL claim under Rule 9(b)'s heightened pleading requirement, *see In re 5–hour ENERGY Mktg. and Sales Practices Li-*

*tig.*, No. MDL 13–2438 PSG (PLAx), 2014 WL 5311272, at *16 (N.D. Cal. Sept. 4, 2014) ("[B]road allegations of reliance are not enough to satisfy the strictures of Rule 9(b)."), the Court finds Plaintiffs have alleged enough facts to satisfy Rule 9(b). Plaintiffs' complaint sufficiently identifies the particular metrics which are allegedly misleading, how they are misleading, where they appeared, and the time period in which the metrics appeared and when Plaintiffs purchased video advertisements:

Who: Facebook, Inc. [Compl. ¶¶ 1–2]

What: Reported advertising viewership metrics—specifically, the "Average Duration of Video Viewed" metric and "Average Percentage of Video Viewed" metric—that were inflated by an estimated 60–80% due to a systematic calculation error. [Compl. ¶¶ 2, 27–34]

When: Between May 4, 2014, and September 23, 2016 [Compl ¶¶ 11, 20 & n. 7, 28, 43]

Where: On the advertising platform that Facebook uses to apprise its video advertisers, including Plaintiffs, how their advertisements are performing (and where advertisers can increase or decrease the budget for their advertisements). [Compl. ¶¶ 19–24]

How: The reported video metrics were misleading because they made video advertisements placed with Facebook appear to receive a higher level of viewer engagement than they actually received. [Compl. ¶¶ 33, 35–41, 56]

Opp'n at 8–9. These facts are sufficient to afford Facebook the opportunity to properly defend itself from Plaintiffs' allegations. *See Chacanaca v. Quaker Oats Co.*, 752 F.Supp.2d 1111, 1126 (N.D. Cal. 2010). And in contrast to *Gold v. Lumber Liquidators*, No. 14-cv-05373-TEH, 2015 WL 7888906, at *1 (N.D. Cal. Nov. 30, 2015), where the Court found the plaintiffs' claim failed under Rule 9(b) because they alleged the defendant used a variety of methods to communicate representations yet failed to specify which ones they were exposed to, here, Plaintiffs' claims focus on two metrics, Facebook's ADVV and APVV, both of which were provided in Facebook's advertising interface. Compl. ¶¶ 24, 66, 68.

Accordingly, the Court DENIES Facebook's motion to dismiss Plaintiffs' UCL claim for failure to meet the Rule 9(b) heightened pleading standard.

### 3. UCL Unfair Prong Analysis

The UCL does not define what constitutes an "unfair" business practice. Therefore, because this definition "is currently in flux" among California courts, the Ninth Circuit has outlined two tests which courts may apply to evaluate whether a practice is unfair: (1) the "public-policy" test, and (2) the "balancing" test. *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 736 (9th Cir. 2007).

Plaintiffs claim that Facebook violated the UCL's unfair prong because Facebook did not "properly audit and verify the accuracy of its video-advertising metrics," and that this "practice was [ ] contrary to legislatively declared and public policies that seek to protect consumers from misleading statements . . . ." Compl. ¶ 57. Plaintiff also alleges Facebook's "failure to employ reasonable auditing and verification procedures gave it an unfair competitive advantage" because it allowed Facebook to provide video advertising at a lower cost while making its video ads appear more effective than they were. *Id.* ¶ 59. The Court turns to address whether Plaintiffs have sufficiently stated a claim under either test.

### a. UCL's Balancing Test is Not Barred by Facebook's Disclaimer

Under the UCL's balancing test, "a plaintiff states a claim if he alleges

that the harm to the public from the business practice is greater than the utility of the practice." *Backus v. Gen. Mills, Inc.*, 122 F.Supp.3d 909, 929 (N.D. Cal. 2015) (citation omitted). Because this determination "is one of fact which requires a review of evidence from both parties," courts are reluctant to grant motions to dismiss "unfair" prong claims under this test. *McKell v. Washington Mut., Inc.*, 142 Cal.App.4th 1457, 1473, 49 Cal.Rptr.3d 227 (2006); *Backus*, 122 F.Supp.3d at 929. Nonetheless, dismissal of a UCL claim is proper where, even when viewing the facts in the plaintiff's favor, a complaint fails to allege a business practice whereby a reasonable consumer would likely be deceived by the practice. *See Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1171 (9th Cir. 2012) (quoting *Bardin v. Daimlerchrysler Corp.*, 136 Cal.App.4th 1255, 1271, 39 Cal. Rptr.3d 634 (2006)); *Friedman v. AARP, Inc.*, 855 F.3d 1047, 1055 (9th Cir. 2017). For example, in *Davis*, the plaintiff alleged that a bank and an electronics store chain defrauded him and the putative class by offering store-branded rewards cards that failed to adequately disclose an annual fee. *Id.* at 1157–58. The trial court disagreed and dismissed the suit for failure to state a claim upon which relief can be granted. The Ninth Circuit affirmed the trial court's holding, finding that the plaintiff had not set forth any facts showing the defendants' actions were unfair. Rather, defendants' advertisement warned that "other restrictions might apply," and "the application process clearly disclosed the annual fee." *Id.* at 1170. Thus, while recognizing that determining whether a business practice is "unfair" is generally a question of fact, the Court held that, even when viewing the facts in the plaintiffs' favor, the specific terms of the advertisements precluded Plaintiffs' UCL claim under the balancing act. *See id.* at 1170–71.

Facebook contends Plaintiffs fail to state a claim under the balancing test because the parties' contract "unambiguously" warned the Plaintiffs about the harm that might flow from Facebook's services. Mot. at 11:22–12:2. Specifically, Facebook points to the following disclaimer, which was contained in its SRR during the Class Period:

WE TRY TO KEEP FACEBOOK UP, BUG–FREE, AND SAFE, BUT YOU USE IT AT YOUR OWN RISK. WE ARE PROVIDING FACEBOOK AS IS WITHOUT ANY EXPRESS OR IMPLIED WARRANTIES INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON–INFRINGEMENT. WE DO NOT GUARANTEE THAT FACEBOOK WILL ALWAYS BE SAFE, SECURE, OR ERROR–FREE OR THAT FACEBOOK WILL ALWAYS FUNCTION WITHOUT DISRUPTIONS, DELAYS OR IMPERFECTIONS.

Duffey Decl., Ex. A at ¶ 16.3; *Id.*, Ex. B at ¶ 15.3. In addition, Facebook relies on *Davis* and other cases where courts have dismissed UCL claims, at the motion to dismiss stage, when a defendant had previously warned the plaintiff of the business practice alleged to be unfair. *See Davis*, 691 F.3d at 1170–71.

Plaintiffs counter that their UCL claim survives the UCL's balancing test because "Facebook has not yet presented any justification for its failure to audit or accredit its video-advertising metrics"; therefore, the Court is not yet in a position to weigh any evidence and make the balancing determination. Opp'n at 10:24–25. Plaintiffs also argue Facebook's disclaimer does not remove the claim from the factual balancing analysis because, unlike the cases Fa-

cebook relies on, in which defendants warned plaintiffs of the exact business practice alleged to be unfair, here, Facebook's disclaimer is too vague to warn a reasonable consumer that Facebook may employ advertising metrics without properly vetting them. *Id.* at 11–12.

The Court agrees with Plaintiffs. Clearly, the Court is currently not equipped with enough factual evidence to conduct a proper balancing test, which weighs against dismissing Plaintiffs' UCL claim at this motion to dismiss stage. *Backus*, 122 F.Supp.3d at 929. Neither party argues otherwise. And while Facebook relies on *Davis* to attempt to entirely forego a balancing analysis, *Davis* is distinguishable. Unlike the disclaimer in *Davis*, where the defendant "clearly disclosed the annual fee," *Davis*, 691 F.3d at 1170, here Facebook's disclaimer is too vague to warn a reasonable consumer that Facebook may provide advertising metrics without properly vetting or auditing them for approximately two years.[2] The ambiguity of Facebook's disclaimer was highlighted during oral arguments. In response to a direct question from the Court as to whether the disclaimer shielded Facebook from all errors contained in its product, Facebook stated this was not its position and that its position was "narrower than that." ECF No. 63:8–17–23. Facebook then proceeded to read verbatim from the disclaimer and explained that "in the context of a software error, [the] disclaimer should apply." *Id.* at

9:6–7. Facebook further explained that "anyone who's dealt with software ... knows that bugs are going to arise. And so those bugs may arise. That's the point of the disclaimer." *Id.* at 9:10–13. But even under Facebook's position, the Court finds it unclear whether the cause of Facebook's alleged mistake falls within the scope of a "software error."[3] Plaintiffs allege their harm was the result of Facebook's "failure to properly audit and verify the accuracy of its video-advertising metrics before disseminating them to Class members." Compl. ¶ 57. Taking this allegation as true and in the light most favorable to Plaintiffs—which the court must—the Court finds Facebook's disclaimer does not preclude a more in-depth balancing test, especially at this stage of the litigation.

Accordingly, the Court DENIES Facebook's motion to dismiss Plaintiffs' UCL claim for failure to allege an unfair practice. Because the Court finds Facebook's disclaimer does not preclude further examination under the UCL balancing test, the Court need not analyze whether Plaintiffs' UCL claim survives under the tethering test.

### ii. Plaintiffs Lack Standing for Injunctive Relief

To have Article III standing to seek injunctive relief in a federal court, a plaintiff must demonstrate "a sufficient likelihood that he will again be wronged in

---

**2.** Similarly, the disclaimers in Facebook's other cited cases clearly disclosed the risk of the exact harm that plaintiffs later alleged was unfair. *See Hodsdon v. Mars*, 162 F.Supp.3d 1016, 1027 (N.D. Cal. 2016) (dismissing UCL claim where defendant's alleged wrongdoing—possible child labor in defendant's supply chain—was disclosed to consumers on defendant's website); *Janda v. T-Mobile, USA, Inc.*, No. C 05-03729, 2009 WL 667206, at *9 (N.D. Cal. Mar. 13, 2009) (dismissing UCL claim where a defendant clearly disclosed the fees plaintiffs alleged to be un-

fair); *Baxter v. Intelius, Inc.*, No. SACV 09-1031, 2010 WL 3791487, at *1, 5 (C.D. Cal. Sep. 16, 2010) (dismissing a UCL claim where the defendant fully and clearly disclosed that clicking on a website button would enroll plaintiffs in a monthly-fee membership program).

**3.** None of the parties' contractual agreements define what a software "bug" is, or what type of errors are included within that definition.

a similar way." *City of L.A. v. Lyons*, 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). Moreover, the Supreme Court has explained that the threat of injury must be both "real and immediate." *Id.* at 102, 103 S.Ct. 1660; *accord Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 948 (9th Cir. 2011).

As part of their complaint, Plaintiffs seek injunctive relief in the form of an order (1) prohibiting Facebook from engaging in the wrongful acts described herein; (2) requiring Facebook to engage third-party auditors to conduct audits and evaluations of Facebook's advertising metrics on a periodic basis and ordering Facebook to promptly correct any problems or issues detected by these auditors, and (3) requiring Facebook to disclose any further inaccurate advertising metrics in a timely and accurate manner. Compl., Prayer for Relief. Notably, however, Plaintiffs have not alleged that any of the Plaintiffs are currently purchasing video advertisements from Facebook or that any of them intend to do so in the future. Thus, Plaintiffs have failed to show a "real or immediate" threat of future injury. Moreover, Plaintiffs reliance on *Lilly v. Jamba Juice Co.*, No. 13-cv-02998-JST, 2015 WL 1248027 (N.D. Cal. Mar. 18, 2015), is unavailing. There the court rejected the notion that injunctive relief is never available to a consumer who learns after purchasing a product that the label is false. Yet, that court also held a plaintiff "must claim [ ] a future interest in a product" in order to have standing to pursue injunctive relief, and further found that "a willingness to consider a future purchase is sufficient" to confer such standing. *Id.* at *5. Other courts are in accord. *See, e.g., Duran v. Creek*, No. 3:15-cv-05497-LB, 2016 WL 1191685, at *7 (N.D. Cal. Mar. 28, 2016) ("Even where courts find standing, most require that the plaintiff plead intent to purchase the products in the future to establish a sufficient threat of future injury."); *Davidson v. Kimberly–Clark Corp.*, 76 F.Supp.3d 964, 970 (N.D. Cal. 2014) ("[W]here a plaintiff has no intention of purchasing the product in the future, a majority of district courts have held that the plaintiff has no standing to seek prospective injunctive relief"); *Rahman v. Mott's LLP*, No. CV 13-3482 SI, 2014 WL 325241, at *10 (N.D. Cal. Jan. 29, 2014) (rejecting the argument that plaintiff lacked standing for injunctive relief because he was aware of the misrepresentation, but finding that such relief required the plaintiff to allege that he intends to purchase the products at issue in the future); *Jou v. Kimberly–Clark Corp.*, No. C-13-03075 JSC, 2013 WL 6491158, at *4 (N.D. Cal. Dec. 10, 2013) (" the Court [ ] rejects Plaintiffs' contention that it is unnecessary for them to maintain any interest in purchasing the products in the future.").

Accordingly, the Court GRANTS Facebook's motion to dismiss Plaintiffs' claim for injunctive relief. Because this deficiency may be cured by amendment, the dismissal is WITHOUT PREJUDICE.

### iii. Plaintiffs' Complaint Sufficiently Alleges a Breach of Implied Duty to Perform With Reasonable Care

Under California law, every contract contains an implied covenant of good faith and fair dealing:

Accompanying every contract is a common—law duty to perform with care, skill, reasonable expedience, and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions is a tort, as well as a breach of the contract. The rule which imposes this duty is of universal application as to all persons who by contract undertake professional or other business engagements requiring the exercise of

care, skill and knowledge; the obligation is *implied by law* and *need not be stated in the agreement.*

*Holguin v. DISH Network LLC*, 229 Cal. App.4th 1310, 1324, 178 Cal.Rptr.3d 100 (2014) (emphasis added) (internal quotation marks and citations omitted). Thus, this duty, being implied by law, is "as much a part of the contract as if expressly set forth." 14A Cal. Jur. 3d *Contracts* § 248 (2017).

■ Plaintiffs allege Facebook had two obligations as a result of Facebook's course of dealing with the Plaintiffs, industry practice, and statements made by Facebook in its Advertiser Help Center and in standardized communications with Plaintiffs: (1) to provide Plaintiffs with an advertising interface where they could create, edit, and monitor their advertisements; and (2) to track the advertising it places and report metrics. Compl. ¶¶ 66–67. And in accordance with California law, Plaintiffs argue, Facebook had a duty to perform these contractual obligations with reasonable care. *Id.* ¶ 68. Plaintiffs allege Facebook breached this duty by incorrectly measuring viewer engagement, including inaccurate data in its interface, and reporting inaccurate advertising metrics to Plaintiffs. *Id.*

On the other hand, Facebook argues Plaintiffs' implied duty claim cannot survive its motion to dismiss because the parties' express contracts are fully integrated and fail to create any duty for Facebook to provide the two metrics at issue here. Further, Facebook claims the parties' contract reserves to Facebook any right not expressly provided to Plaintiffs. Mot. at 13:26–14:2. Thus, the express terms of the parties' contract bars any implied duties or obligations. Second, Facebook argues that even if the parties' contract can give rise to implied-in-fact obligations, Plaintiffs have failed to plead sufficient facts that give rise to a duty for Facebook to provide average duration metrics. *Id.* at 14:9–11; Reply at 10–12. And third, even if such an implied-in-fact obligation exists, California law does not impose the implied duty of care to implied contract terms. Mot. at 14:11–13. The Court turns to address these arguments.

### 1. The Parties' Contract Does Not Preclude Implied Duties

In support of Facebook's contention that Plaintiffs cannot assert any implied duties, it points to Facebook's Statement of Responsibilities and Rights ("SRR"). This "master document" sets forth the "terms of service that governs [Facebook's] relationship with users and others who interact with Facebook." Duffey Decl., Exs. A–B. And "[b]y using or accessing Facebook, [Plaintiffs] agree[d] to this statement...." *Id.* The SRR contains an integration clause: "This statement makes up the entire agreement between the parties regarding Facebook, and supersedes any prior agreement." Duffey Decl., Ex. A, ¶ 19.2; Duffey Decl., Ex. B, ¶ 18.2. Because the SRR makes no explicit mention of advertising metrics, Facebook argues it has "no express contractual obligation to provide metrics"; and because the SRR contains a integration clause, Facebook argues the contract cannot be supplemented by implied terms.

Plaintiffs respond, in relevant part, by citing to *Lennar Mare Island, LLC v. Steadfast Ins. Co.*, 176 F.Supp.3d 949 (E.D. Cal. 2016) and arguing that the parties' course of performance[4] may supple-

---

4. A "course of performance" is a sequence of conduct between the parties to a particular transaction that exists if:

(1) the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and

ment the contract. Opp'n at 19. In *Lennar Mare* the court examined the relationship between ambiguity and the admissibility of course of performance evidence. *Id.* at 964–967. After a lengthy, thorough, and well-reasoned analysis of California case law, Judge Mueller concluded "course of performance evidence [is] admissible to explain or supplement but not to contradict the terms of an *integrated* agreement, *even when the agreement's written terms are unambiguous.*" *Id.* at 966 (emphases added). After examining the cases and reasoning underlying that court's conclusion in *Lennar Mare,* this Court agrees that course of performance evidence can supplement or explain, but not contradict, a fully integrated, unambiguous contract. As a result, Facebook's integration clause does not entirely preclude any implied duties. This conclusion is further bolstered by California case law. In *Kuitems v. Covell,* 104 Cal.App.2d 482, 485, 231 P.2d 552 (1951), the court was addressing a controversy arising from the installation of a roof. The defendant, a roofing contractor, had entered into a contract with the plaintiff to install a roof in exchange for payment. Although the defendant installed the roof, the plaintiff later sued the contractor for breach of contract because the roof failed to properly drain water from rainfall, which resulted in damage to the plaintiff's home. *Id.* at 484, 231 P.2d 552. The defendant argued there was no implied duty because the parties' contract contained no written warranty that the roofing material would withstand pressure of static water. *Id.* at 484, 231 P.2d 552. Moreover, the parties' contract contained an integration clause. *Id.* In spite of this clause and the lack of an express term requiring the roof to withstand static wa-

ter pressure, the court held it would not "furnish the [defendant] an avenue of escape from the entirely reasonable obligation implied in all contracts to the effect that the work performed shall be fit and proper for its said intended use." *Id.* at 485, 231 P.2d 552 (internal quotation marks omitted). Hence, because a "proper" roof would be expected to effectively keep water out of a house, the court found the contractors were liable for breach of contract. *Id.*

In sum, the Court finds it need not address whether the parties contractual terms were fully integrated or not because, in any event, Plaintiffs may introduce course of performance evidence to explain or supplement the agreement.

Next, Facebook relies on a separate clause in the SRR to attempt to foreclose any finding of implied duties. This clause states that "[Facebook] reserve[s] all rights not expressly granted to [Plaintiffs]." Duffey Decl., Ex. B, ¶ 18.10. Although Facebook cites to *Cohen v. Paramount Pictures Corp.,* 845 F.2d 851, 854–55 (9th Cir. 1988) and *Novell, Inc. v. Unicom Sales, Inc.,* No. C 03-2785, 2004 WL 1839117, at *11 (N.D. Cal. Aug. 17, 2004), to support its assertion that its "reservation" clause precludes Plaintiffs from alleging Facebook had any implied duties, these cases are inapposite. In *Cohen,* the plaintiff granted a film studio a license to exhibit a film in theatres and "by means of television." *Cohen,* 845 F.2d at 852–53. The film studio later produced videocassettes of the film and sold them for profit. *Id.* The plaintiff sued the film studio claiming he never granted it the right to distribute videocassettes of the film. *Id.* The court

(2) the other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.

Cal. Com. Code § 1303(a) (West 2017).

identified the issue in the case as "whether [the] license conferring the right to exhibit a film 'by means of television' includes the right to distribute videocassettes of the film." *Id.* at 852. In holding that the license did not include the right to distribute videocassettes, the court relied, in part, on a clause in the defendant's license that reserved to the plaintiff "all rights and uses ..., except those herein granted to the licensee." *Id.* at 854. However, the "primary reason" why this reservation clause prohibited distribution of videocassettes was because the language in the reservation clause "preclude[d] uses not then known to, or contemplated by the parties." *Id.* Thus, because videocassette recorders were not invented or known when the license was executed, the Court found the plaintiff could not have granted a right to distribute videocassettes, nor could the film studio have bargained for or paid for such a right. *Id.*

Here, unlike the videocassette technology in *Cohen* that was not in existence at the time the parties entered their agreement, it cannot be said that video advertising metrics were not in existence, or contemplated by the parties, when they entered into their agreement. This is especially true in light of references in the parties' contract to "self-service advertising interfaces" and the use of Facebook advertising data "to assess the performance and effectiveness of [Plaintiffs'] advertising campaigns." Exs. D, E. Also, in *Novell*, while examining whether an agreement described a sale or a license, the court acknowledged the agreement expressly stated that any rights not expressly granted were reserved to the software company. *Novell*, 2004 WL 1839117, at *11. But the court provided virtually no analysis as to how this provision "limited [the company's] duties to those expressly stated," as Facebook claims in its brief. Mot. at 15:12–15. Rather the court ad-

dressed whether the parties' contract described a sale or a license, and it did so without ever relying on the reservation clause in the software contract. In sum, Facebook cannot foreclose a finding of implied duties solely by arguing its contract was fully integrated or by pointing to its reservation clause.

### 2. Course of Performance Supports an Implied Duty

This brings the Court to the next inquiry: whether Plaintiffs have alleged facts that give rise to an implied duty for Facebook. For the following reasons, the Court finds the Plaintiffs have sufficiently alleged a course of performance that gives rise to Facebook's duty to provide advertising metrics.

 When interpreting a contract, the court's duty is to give effect to the parties' intentions at the time they entered the contract. Cal. Civ. Code § 1636. "[T]he most reliable evidence of the parties' intentions" is their conduct after the contract is signed and before any controversy has arisen. *Emp'rs Reinsurance Co. v. Superior Ct.*, 161 Cal.App.4th 906, 921, 74 Cal. Rptr.3d 733 (2008). The Supreme Court of California has explained why this is so:

> "This rule of practical construction is predicated on the common sense concept that 'actions speak louder than words.' Words are frequently but an imperfect medium to convey thought and intention. When the parties to a contract perform under it and demonstrate by their conduct that they knew what they were talking about the courts should enforce that intent."

*Crestview Cemetery Ass'n v. Dieden*, 54 Cal.2d 744, 754, 8 Cal.Rptr. 427, 356 P.2d 171 (1960).

 Here, Plaintiffs' complaint sufficiently alleges that Facebook regularly

provided the Plaintiffs with advertising metrics, including the ADVV and APVV metrics. Compl. ¶¶ 1–2, 20, 22–25, 28, 33, 56, 63.[5] And Facebook concedes that it did in fact provide purchasers of video advertisement with advertising metrics. Mot. at 3:19 ("Starting in May 2014, Facebook began providing its video advertisers with video metrics."). During oral arguments, Facebook contended these metrics were provided for free, as a complementary service. ECF No. 63 at 4:13–15. But this argument is unavailing to Facebook at this motion-to-dismiss stage because, under California law, "[w]hether a transaction is a gift is a question of fact to be determined from all the evidence." *In re Dyer*, 322 F.3d 1178, 1188 (9th Cir. 2003). Also, Facebook's argument that California contract law only allows course of performance evidence to resolve ambiguities, Reply at 11:2–4, is directly refuted by *Lennar Mare*, as explained above. *See supra* section III(b)(iii)(1). In short, the Court finds Plaintiffs have sufficiently alleged a course of conduct that gives rise to Facebook's duty to provide advertising metrics.

### 3. California Law Does Allow Implied Duties to Apply to Implied Terms

Finally, Facebook argues that even if the parties' contract does not foreclose the existence of implied contractual duties, Plaintiffs' claim fails because "the case law concerning the implied duty to perform contractual duties with reasonable care has only been applied to duties that arose out of the express terms of a contract." Mot. at 15:24–27. But the cases Facebook relies on for this proposition do not support it. For example, in *Holguin*, the court was review-

ing a trial court's finding that the parties' contractual agreements contained an implied term to exercise reasonable care in installing satellite television equipment. The plaintiffs sued several satellite television providers after a technician conducted an improper installation at the plaintiffs' home. *Holguin*, 229 Cal.App.4th at 1315, 178 Cal.Rptr.3d 100. The technician drilled into a sewer pipe in the plaintiffs' wall, fed a cable through it, and patched the wall without repairing the pipe. *Id.* The damaged pipe leaked sewer water inside the wall cavity and caused mold buildup that caused the plaintiffs to suffer health issues. *Id.* The plaintiffs argued that the parties' contract contained an implied term requiring proper installation of their satellite dish. The defendants disagreed, arguing that the contract did not address satellite installation. *Id.* at 1317, 178 Cal. Rptr.3d 100. The court affirmed the trial court because even though the parties' contract did not address satellite installation, the parties' contract did "contemplate[ ] installation of satellite television equipment." *Id.* at 1324, 178 Cal.Rptr.3d 100. Thus, contrary to Facebook's assertion, the implied duty attached to the contract because the contract "contemplated" the duty, not because the contract contained an express duty to perform repair work.

Here, viewing the facts in the light most favorable to Plaintiffs, the Court finds that the parties' contract contemplates Facebook's duty to provide advertising metrics with its video advertising services. Again, as mentioned above, the parties' contract specifically references advertising metrics.

---

**5.** Although Facebook argues that Plaintiffs' course-of-performance argument must fail because Plaintiffs never once mentioned "course of performance" in its complaint, the Court finds Plaintiffs have alleged sufficient facts to support this claim in these cited para-

graphs. *See Humboldt Baykeeper v. Simpson Timber Co.*, No. C. 06-04188CRB, 2006 WL 3545014, at *5 (N.D. Cal. Dec. 8, 2006) (rejecting the notion that a complaint must put forth "magic words" when the complaint alleges sufficient facts to support a claim).

Facebook's Self–Service Ad Terms specifically reference "use of the self-service advertising interface." Duffey Decl., Ex. D. And Facebook's Advertising Guidelines also state that customers could use "Facebook advertising data ... on an aggregate and anonymous basis ... to assess the performance and effectiveness of your Facebook advertising campaigns." *Id.*, Exs. E–O. Thus, the parties' contract, like the contract in *Holguin*, can support Plaintiffs' implied duty claim.

In sum, Plaintiffs' implied-duty claim survives Facebook's motion to dismiss. California case law recognizes that course of performance evidence is allowed to explain or supplement integrated contracts even when the contract is unambiguous. Here, there is no doubt that Facebook had been providing advertising metrics to Plaintiffs as part of its advertising services. This course of performance sufficiently supports Plaintiffs' implied duty claim. And under California law, implied duties may be required to be performed with reasonable care. Facebook's arguments to the contrary are unavailing.

Accordingly, the Court DENIES Facebook's motion to dismiss Plaintiffs' claim for breach of implied duty to perform with reasonable care.

### iv. Quasi–Contract Claim

■■■■■ In order to sufficiently plead a quasi-contract claim, the plaintiff must allege (1) a defendant's receipt of a benefit and (2) unjust retention of that benefit at the plaintiff's expense. *Peterson v. Cellco Partnership*, 164 Cal.App.4th 1583, 1593, 80 Cal.Rptr.3d 316 (2008). "The doctrine applies where plaintiffs, while having no enforceable contract, nonetheless have conferred a benefit on defendant which defendant has knowingly accepted under circumstances that make it inequitable for the defendant to retain the benefit without paying for its value." *Hernandez v. Lopez*,

180 Cal.App.4th 932, 938, 103 Cal.Rptr.3d 376 (2009). However, as both parties acknowledge in their briefs, "[i]t is well settled that an action based on an implied-in-fact or quasi-contract cannot lie where there exists between the parties a valid express contract covering the same subject matter." *O'Connor v. Uber Techs., Inc.*, 58 F.Supp.3d 989, 999–1000 (N.D. Cal. 2014).

■■■■ Facebook argues Plaintiffs' quasi-contract claim should be dismissed because "there is an enforceable contract in the record that covers the subject matter of Plaintiffs' unjust-enrichment claim." Mot. at 18:10–12. In support of this argument, Facebook cites Facebook's SRR, Self–Serve Ad Terms, Advertising Guidelines, and Payment Terms. *Id.* On the other hand, Plaintiffs argue there is no contract that covers the subject matter because these documents do not "cover the two [advertising] metrics at issue here." Opp'n at 23:5–10. Additionally, Plaintiffs argue the court should not dismiss their quasi-contract claim "[w]here there is a general issue of material fact as to whether the contract governed the matter at-issue," because should a factfinder determine Facebook's contracts do not cover the advertising metrics, Plaintiffs will be left without a remedy. *Id.* at 23:15–26. Facebook is correct on this issue. The mere fact that Facebook's contracts do not expressly mention the two advertising metrics at issue here does not mean the contract does not govern the subject matter at issue here—i.e., Facebook's advertising services. In addition, Plaintiffs conceded during oral arguments that they "do believe that the advertising services that are part of [the parties'] contract include performance metrics." ECF No. 63 at 32:23–33:2. And even though Federal Rule of Civil Procedure 8 allows Plaintiffs to seek inconsistent causes of action, this rule does not overcome the California state-law doctrine that

"there cannot be a claim based on quasi contract where there exists between the parties a valid express contract covering the same subject matter." *Smith v. Allmax Nutrition, Inc.*, No. 1:15-cv-00744-SAB, 2015 WL 9434768, at *9 (E.D. Cal. Dec. 24, 2015).

Accordingly, the Court GRANTS Facebook's motion to dismiss Plaintiffs' quasi-contract claim. Because there is an enforceable contract that governs the Facebook's advertising services, any further amendment would be futile. Thus, the dismissal is done WITH PREJUDICE.

## IV. CONCLUSION

In summary, for the foregoing reasons, the Court:

- -GRANTS Facebook's request for judicial notice of Facebook's contractual documents
- -DENIES Facebook's request for judicial notice of Mr. Fischer's Facebook post.
- -GRANTS Facebook's motion to dismiss Plaintiffs' UCL claim WITHOUT PREJUDICE
- -GRANTS Facebook's request for injunctive relief WITHOUT PREJUDICE
- -DENIES Facebook's motion to dismiss Plaintiffs' claim for breach of implied duty to perform with reasonable care.
- -GRANTS Facebook's quasi-contract claim WITH PREJUDICE.

Plaintiffs may amend all claims dismissed without prejudice no later than **August 14, 2017.** Failure to file timely amendment will lead to dismissal of such claims with prejudice.

**IT IS SO ORDERED.**